In re BCI PANCAKE HOUSE, INC., Blue Coat Inn, Inc., Patriot Enterprises, L.L.C., Hospitality Organizational Management Enterprises, Inc., Debtors.

BCI Pancake House, Inc., Blue Coat Inn, Inc., Patriot Enterprises, L.L.C., Hospitality Organizational Management Enterprises, Inc., Plaintiffs,

v.

Morris, James, Hitchens & Williams, William R. Hitchens, Jr., Norris P. Wright, Parkowski, Noble & Guerke, P.A., George F. Gardner, III, First Commercial Services, Inc., and Stephen J. McCann Defendant(s)

Bankruptcy Nos. 95–00208, 95–00207, 95–00206, 95–00205.
Adversary No. 96–198.

United States Bankruptcy Court, D. Delaware.

Nov. 27, 2001.

Gregory A. Sioris, New York City, Henry A. Heiman, Heiman, Aber & Goldlust, Wilmington, DE, for Plaintiffs.

John A. Parkins, Jr., Richards, Layton & Finger, Wilmington, DE, for Morris, James, Hitchens & Williams, William R. Hitchens, Jr., and Norris P. Wright.

Stephen J. McCann, Salisbury, MD, pro se.

## MEMORANDUM OPINION [1]

JUDITH K. FITZGERALD,
Bankruptcy Judge.

*Introduction*

The matter before the court is Debtors' ("Plaintiffs") Complaint [2] seeking damages for legal malpractice against William R. Hitchens, Jr. ("Mr. Hitchens"), Norris P. Wright ("Mr. Wright"), and the law firm of Morris, James, Hitchens & Williams ("Morris James"), collectively referred to as "the Morris James Defendants". Mr. Hitchens and Mr. Wright are partners in Morris James. This malpractice claim involves the assertion by Plaintiffs that they consulted Morris James and its attorneys concerning a loan they wished to incur. In addition to asserting that the Morris James Defendants did not properly investigate the lender in advance of when Plaintiffs agreed to the loan, Plaintiffs claim they were defrauded because material in-

---

1. The court's jurisdiction was not at issue. This Memorandum Opinion constitutes our findings of fact and conclusions of law. By Opinion and Order of April 30, 1999, summary judgment was granted in favor of George F. Gardner, III, and the firm of Parkowski, Noble & Guerke, P.A. With the consent of its principal, Stephen McCann, default judgment was entered against First Commercial Services, Inc., by Order dated June 10, 1999. At the time the Complaint was filed, First Commercial had ceased doing business and never answered the Complaint.

In addition, at the end of closing arguments, the Morris James Defendants were given the opportunity to submit an unpublished opinion from the Delaware Superior Court for our consideration. Plaintiffs and Mr. McCann were given an opportunity to provide cases in response thereto by July 28, 2000. Subsequent to July 28, 2000, the parties continued to file documents although the pleadings have been closed. Anything that the parties have filed in this case subsequent to July 28, 2000, has not been authorized to be filed and has not been considered by the court.

2. Plaintiffs BCI Pancake House and Blue Coat Inn maintained two restaurants in Dover, Delaware. Plaintiff Patriot Enterprises was formed to own real property. Plaintiff Hospitality Organizational Management Enterprises was formed to function as a management company for the restaurants. The Complaint also requested an order requiring the expungement of liens entered against Plaintiffs' assets in connection with a loan that was never consummated and that is at the center of this controversy. The liens have been marked satisfied.

formation was withheld from them by the Morris James Defendants and Mr. McCann after the loan failed to close.

Plaintiffs also seek damages against Stephen J. McCann, asserting that he induced them to use him, his now defunct company, First Commercial Services, Inc., and Charmeuro Ltd. to obtain the loan.

Trial was held on June 30, November 1 and 2, 1999, January 10, 2000, February 14, 2000, and June 30, 2000, with closing arguments heard on July 17, 2000.

*Background*

Plaintiffs' claims arose from a failed loan transaction, the history of which follows. Before the Morris James Defendants were engaged to represent Plaintiffs in connection with the loan, Plaintiffs had obtained a loan commitment letter from UCL (the Usher Trust), a non-traditional, foreign lender, dated June 9, 1994, and on June 13, 1994, had paid a $5,000 loan fee.[3] *See* Morris James Exhibits 10, 11. Prior to obtaining the commitment and paying the fee, Plaintiffs consulted the Morris James Defendants in May of 1994, not about the loan but with respect to tax advice, estate planning and the reorganization of the businesses.

On or about July 7, 1994, after Plaintiffs obtained the commitment letter and paid the loan fee, Norris Wright of Morris James met with John Koutoufaris, his son Marcos, and Richard Seifert, Plaintiffs' then chief financial officer, at which time Plaintiffs informed Mr. Wright of the loan and of their desire to close on it by the end of that month. According to Mr. Seifert, the loan and a quick closing were sought because Plaintiffs' obligations to their suppliers were significantly in arrears and the conditions imposed by Plaintiffs' vendors had to be met on a daily basis.

Mr. Wright testified that he examined the commitment letter at the July, 1994, meeting, in the company of Marco Koutoufaris, Plaintiffs' primary representative at the time. The July, 1994, meeting was the first he had with the Koutoufarises after the earlier introductory meeting in April of 1994 regarding some tax considerations. Wright, Tr. 11-1-99 at 630-31. Indeed, the engagement letter dated May 13, 1994, sent by Morris James to Plaintiffs contains no reference to a loan transaction. Plaintiffs' Exhibit 12. Mr. Wright told them the provisions of the loan were onerous, would tie up all their assets for the foreseeable future, and were like a noose around their necks. Mr. Seifert was present when Mr. Wright conveyed this opinion. The Koutoufarises replied that they had already paid the commitment fee of $5,000, there were no other lenders, and this loan was their only hope. Wright, Tr. 11-1-99 at 642-43. Mr. Seifert, who was present, corroborated this. Tr. 11-1-99 at 775. Mr. McCann's testimony also supports this version of events. Mr. McCann testified that at the same July 1994 meeting Mr. Wright told Marcos Koutoufaris that the terms of the loan were "extraordinarily stringent" and that Marcos Koutoufaris responded that he knew it, but the loan was their "last hope, and they had to go forward with it." Tr. 2-14-00 at 36.[4]

---

**3.** The lender initially requested a commitment fee of $10,000 which was reduced at the request of Stephen McCann's partner, Alan Start.

**4.** At trial, Marcos Koutoufaris refused to admit or deny that he said the loan was the last hope. He explained this testimony as "referring to the fact that it was … better … than a conventional loan with a bank." Tr. 6-30-99 at 207-09. We do not credit this explanation of the reference to the "last hope" and find that Plaintiffs pursued the transaction with the Usher Trust because only the Trust had expressed interest in dealing with them.

Mr. Seifert testified that the loan was needed and the vendors were pressing for funds. He stated that John Koutoufaris "was quite adamant in using me as leverage with the vendors to give them hope that funds were forthcoming and, therefore, they would be paid in full." Seifert, Tr. 11–2–99 at 775–76. Plaintiffs owed suppliers in excess of $385,000. They also had significant tax and mortgage liabilities. He further testified that the pressure on Plaintiffs was "intense" through the spring and summer of 1994. *Id.* Further, Plaintiffs were in debt to the IRS in the amount of at least $400,000, and to the Delaware Division of Revenue in the amount of approximately $70,000, including withholding taxes which they began to forego paying in 1992.

Mr. Seifert testified that in late March 1994 when he began his employment with Plaintiffs, they had no corporate financial statements and their financial picture was not capable of being completed with the available information. He testified that he found unopened letters from the IRS, that Plaintiffs' financial situation was desperate, and that they were living on borrowed time. *See* Tr. 11–2–99 at 758–63. Mr. Seifert met with Wilmington Trust, Plaintiffs' major creditor, and was informed that the bank wanted Plaintiffs to find other financing. Plaintiffs owed Wilmington Trust in excess of $1.726 million on a mortgage on the Blue Coat Inn and the Glasgow Inn and were in default on their mortgage with PNC on the Pancake House (the mortgage amount was in excess of $272,500). The mortgage with Wendover Funding on the Mallard House (office premises owned by Plaintiffs) was in arrears as well in the amount of approximately $226,030, even though funds Plaintiffs received from their tenants through monthly rental payments exceeded the amount of the monthly mortgage payment. In addition, Plaintiffs' purveyors, including

their two main food suppliers, refused to extend further credit. He testified that Plaintiffs were unable to support their debt load and had trouble even making payroll. Local banks had refused to lend to Plaintiffs and they had to resort to unconventional financing. *Id.* at 763–64.

Mr. McCann's testimony corroborates Mr. Seifert's assessment of Debtors' situation. Mr. McCann testified that creditors "were continuing to get quite vociferous in their demands for payment." Tr. 2–14–00 at 35. In addition, at Marcos Koutoufaris's request, Mr. McCann called a representative at Atlantic Foods, one of Debtors' major suppliers. The representative informed Mr. McCann that creditors were considering an involuntary bankruptcy. Mr. McCann then wrote to the representative explaining Debtors' efforts to obtain refinancing. This held the creditors at bay for a little while.

Marcos Koutoufaris also testified that there was "considerable pressure" from creditors amounting to what he viewed as harassment on an almost daily basis. Tr. 6–30–99 at 204–5. He testified that Plaintiffs made an attempt to reach a compromise with some of their suppliers but those who agreed insisted on payment by August, 1994. Thus, Plaintiffs were under this pressure, as well.

Plaintiffs sought the loan to implement a financial restructuring plan which would satisfy their existing debt. To that end, Plaintiffs sought to borrow $3,250,000 which would satisfy the existing debt. However, the lender decided that Plaintiffs' existing assets would not provide the cash flow needed to pay down the debt. At some point the amount of the loan increased to $6,950,000 in order to also fund the purchase of another building, the rents from which could improve Plaintiffs' cash flow. The lender was a British entity

variously referred to as the Usher Trust (UCL) or Charmeuro[5] throughout trial. Through Stephen McCann, Plaintiffs approached the Usher Trust because attempts to secure domestic conventional financing had been unsuccessful. Prior to this time, Plaintiffs' principals, John and Marlene Koutoufaris and their son, Marcos, had been involved in "a loan failure situation arising from a bogus New York mortgage banker in 1993," Complaint at ¶¶ 9, 10, and were anxious not to repeat the experience.[6] However, before embarking on the loan process with the Usher Trust, Plaintiffs did not seek the advice of counsel. Defendant Stephen McCann served as the agent for the Usher Trust in the United States at the time Plaintiffs sought funding. Mr. McCann disclosed to the Koutoufarises that he and his partner, Alan Start, had two loan applications pending with the Usher Trust at the time Plaintiffs sought funding. Mr. McCann had expended $7,000 in commitment fees on his and his partner's behalf. In the summer of 1994, the Usher Trust sent a representative, John Russell, to the United States to inspect the Plaintiffs' businesses in preparation for finalizing the loan. Although Plaintiffs had consulted with the Morris James Defendants by this time, they did not involve the Morris James Defendants in this meeting.

In the meantime, because Plaintiffs were being dunned by creditors, including mortgagees, they requested that Norris Wright draft a letter that Plaintiffs could give to their creditors which explained that new funding was expected and that they would be paid in full. *See* Morris James Exhibit 20 (letters from various creditors regarding payment terms).

A "dry" settlement with the Usher Trust took place on September 16, 1994; i.e., documents were signed but funds were not transferred pending approval by the British lender of the final loan documentation.[7] In connection with the settlement, liens in favor of the lender were imposed on Plaintiffs' and the Koutoufarises' property pending funding of the loan in order to prevent Plaintiffs' creditors from taking threatened action which would give them a priority over the new lender. The loan never funded and on November 17, 1994, Nigel Jowsey, an employee of the Usher Trust, faxed to George Gardner, the Usher Trust's counsel in the U.S., with a copy to Mr. McCann, ("the British faxes") the information that the Usher Trust was being investigated by the fraud squad of the Nottinghamshire, England, Constabulary. Mr. Jowsey also informed Mr. Gardner that he had been instructed by the fraud squad to not issue paperwork so no further action on the loan would be taken. Plaintiffs' Exhibit 193. On November 18, 1994, Alan Start faxed to Mr. Gardner, with a copy to Mr. McCann, information concerning an unofficial investigation of the Usher

---

5. Charmeuro was not the lender but the disburser of funds. Credit Suisse was to be the source of funds. Plaintiffs complain that they did not know that Credit Suisse would be involved. Plaintiffs' counsel argued at trial that the information that the money was coming from Credit Suisse misled creditors. How this was so and what significance it has to the issue of Defendants' liability to Plaintiffs was not explained. The Usher Trust's accounts were maintained in the Security Section of the Trust Department of Credit Suisse. Marcos Koutoufaris testified that he

had so informed his father. Tr. 6–30–99 at 221. Plaintiffs' assertion that the fact that Credit Suisse was to supply the funds is grounds for judgment in their favor in this adversary proceeding is without merit.

6. Plaintiffs obtained a judgment against the prior lender.

7. Settlement was delayed until September, 1994, because Plaintiffs had changed the terms of the loan several times and each change had to be approved by the lender.

Trust and a meeting with a potential substitute lender the following day. Plaintiffs' Exhibit 194.

By fax dated November 22, 1994, Mr. Gardner transmitted to Mr. Wright a copy of Nigel Jowsey's November 17 fax (Plaintiffs' Exhibit 193), Alan Start's November 18 fax (Plaintiffs' Exhibit 194), and Mr. McCann's fax to George Gardner of November 21 concerning alternative funding. *See* Plaintiff's Exhibit 197. Mr. McCann sent a second fax to Norris Wright dated November 22 concerning problems he was having due to the investigation in England of the Usher Trust and concerning alternative funding. Plaintiffs' Exhibit 198.

Mr. McCann testified that he sent a copy of the British faxes to Marcos Koutoufaris about the time he received them and he typed a note addressed to "Marc" on the bottom of the November 17 fax. Tr. 2–14–00 at 50, 51. Alan Start testified that Mr. McCann told him at the time that he had forwarded the faxes to Marcos Koutoufaris. Tr. of 3–27–00 at 68–69. Mr. McCann spoke to Marcos Koutoufaris the same day he forwarded the British faxes to him, November 18, 1994, mentioned the police investigation that was referred to in the faxes, and Marcos Koutoufaris admitted speaking with Mr. McCann that day. *See* Marcos Koutoufaris, Tr. 6–30–99, at 303; McCann, Tr. 2–14–00 at 47–48, 91–92. Mr. McCann further testified that he received the first British Fax on November 17, 1994. Tr. 2–14–00 at 47–48. Mr. Wright received the faxes on November 22, 1994, and Marcos Koutoufaris testified that he spoke with Mr. Wright on November 23, 1994, concerning them, stating that he had received copies of them from Mr. McCann, and that he understood that there was something "seriously wrong". Marcos Koutoufaris, Tr. 6–

30–99 at 256; Wright, Tr. 11–1–99 at 658–59. Marcos Koutoufaris testified that this conversation with Mr. Wright lasted five minutes at the most but Mr. Wright testified that his telephone bill showed that the conversation lasted approximately 19 minutes. Wright, Tr. 11–1–99 at 657–58.

Plaintiff's Exhibit 199 is Norris Wright's letter to Mr. McCann dated November 23, 1994, stating that he received the British faxes from George Gardner and found the explanation of the failure to fund the loan incredible. Plaintiffs' Exhibit 202 is a fax from Mr. McCann to Marcos Koutoufaris dated November 28, 1994, "updating" him on the situation.[8]

■ The standard for legal malpractice in Delaware requires the plaintiff to prove (1) employment of an attorney, (2) the attorney's neglect of a reasonable professional responsibility, and (3) a resultant loss. *Jackson v. Lobue*, 2001 WL 695540 at *2 (Delaware.Super., June 15, 2001), citing *Weaver v. Lukoff*, 511 A.2d 1044, 1986 WL 17121 (Delaware.1986)(Table, Text in Westlaw). Plaintiffs in this case established employment of counsel but did not establish that counsel neglected professional responsibilities, nor did Plaintiffs establish that the loss they suffered was due to counsel's neglect of a responsibility. In addition, expert testimony is required to establish legal malpractice. *Id.* The only exception is when the negligence "is so obvious that it would be apparent to any layman exercising ordinary common sense." *Id.* Plaintiffs submitted the testimony of Professor Geoffrey Hazard, professor of law at the University of Pennsylvania law school, but Professor Hazard's testimony was that counsel acted within the bounds of professional responsibility. *See infra* at 20.

---

**8.** An "update" implies prior communication of information and is consistent with the testimony of all witnesses except that of the Koutoufaris witnesses.

We find that Plaintiffs were notified of the British faxes as soon as Defendants knew of them. The assertion that the existence of the British faxes was concealed from Plaintiffs is simply not supported by the evidence. The credible testimony does not support Plaintiffs' version of the facts and, as will be explained in more detail below, we will enter judgment in favor of all Defendants.

*Liability of Stephen McCann*

■ With respect to Mr. McCann, the Complaint seeks damages and exemplary damages for breach of contract, negligence, and/or recklessness. Plaintiffs allege that

1. Mr. McCann made negligent misrepresentations concerning the status of the lender and its ability to lend the $6.95 million;

2. Mr. McCann had a duty to Plaintiffs to find alternative funding for them after the Usher Trust loan failed;

3. Mr. McCann failed to inform Plaintiffs in November of 1994 that the lender was being investigated for fraud.

Plaintiff's allegations are not supported by the evidence or testimony. The record is devoid of evidence that Mr. McCann made any representations, negligent or otherwise, concerning the lender's status or ability to lend. Alan Start testified that he investigated Rowan Leigh–James of the Usher Trust before paying a commitment fee on behalf of himself and Mr. McCann and all information indicated that Mr. Leigh–James was a legitimate businessman who was capable of funding the loan. Start, Tr. 3–27–00 at 17–19. Inquiries to the police in the United Kingdom revealed only that *no actions were pending.* Tr. 3–27–00 at 18.[9] The lender's U.S. counsel stated that there were no indications of

fraud in his dealings with the lender. Gardner, Tr. 11–2–99 at 864. Plaintiffs' expert, Professor Geoffrey Hazard, saw no signs of a fraudulent transaction in the documents he reviewed. Hazard, Tr. 11–1–99 at 581.

Mr. McCann testified that when Mr. Start met Rowan Leigh–James of the Usher Trust he obtained references from his own attorney and another group called "the Partnership" who had conducted business with the Usher Trust. Mr. Start confirmed with two banks that the Trust and Leigh–James had accounts and "large activities". He confirmed that loans had actually funded through Leigh–James and the Trust and he checked with the Nottinghamshire Constabulary, the same entity referred to in the November 17, 1994, British fax, and determined that there was no information available. He checked the Trust's registration and found it current and legitimate as of February and March of 1994. Mr. Start met one Robin Dawson who had an investigative firm and worked part-time for the British government. Mr. Dawson confirmed to Mr. Start that Leigh–James had large bank accounts, had "banking relationships", and had the ability to do the loans. Mr. McCann testified that in April or May of 1994 Mr. Leigh–James sent a copy of correspondence that indicated that he had a line of credit with Credit Suisse and that Mr. Start investigated this claim and found it to be true. Tr. 2–14–00 at 62–63. Mr. McCann further testified that he "saw no reason" to do his own investigation and that he relied on that of Mr. Start, who lived in England. *Id.* at 75. We find this reasonable inasmuch as the investigation performed by Mr. Start was conducted at about the same time Plaintiffs were negotiating a loan with the Trust. There is no evidence to sup-

9. Mr. Start testified that because personal privacy laws in the United Kingdom "are very strict" only "basic questions" would be answered. Tr. 3–27–00 at 18.

port Plaintiffs' allegation that Mr. McCann did not exercise reasonable care or competence in connection with the loan.

Nothing in the record before us indicates that Mr. McCann would have had a reason to make any misrepresentations. He also was an applicant for a loan. Because it did not fund, Mr. McCann did not benefit from the transaction. There is also no evidence that the information that Mr. McCann supplied to Plaintiffs was false nor that he was in possession of information that he failed to communicate to Plaintiffs.

With respect to Plaintiffs' assertion that Mr. McCann had an obligation to find alternative funding for them, there was no evidence adduced to establish a basis for this alleged duty. Even if Mr. McCann had such an obligation, the evidence at trial established that, in fact, he began to seek alternative funding for Plaintiffs as soon as the investigation of the lender was made known to him in November of 1994. *See* Plaintiffs' Exhibit 194, fax of November 18, 1994, from Stephen McCann to George Gardner. *See also* Plaintiffs' Exhibit 195, undated fax to Marcos Koutoufaris; Plaintiffs' Exhibit 196, fax of November 21, 1994, to George Gardner from Stephen McCann; Plaintiffs' Exhibit 198, fax of November 22, 1994, to Norris Wright from Stephen McCann; Plaintiffs' Exhibit 202, fax of November 28, 1994, to Marcos Koutoufaris; Plaintiffs' Exhibit 203, documents Marcos Koutoufaris forwarded to Norris Wright regarding new proposed lender. However, in light of Plaintiffs' financial condition, Mr. McCann was not successful in the attempt.[10]

The only assurances Plaintiffs received concerning the ability of the lender to fund the loan came from the lender itself through its employee John Russell who traveled to the United States to meet with Plaintiffs concerning their loan application. Further, Mr. McCann made known to Plaintiffs that his loan had not been funded when he first met with Plaintiffs in May of 1994. Mr. Russell represented to Plaintiffs that the Usher Trust had funded other loans and that the settlement would be dry until representatives of the Trust received the signed loan documents in England and executed the documents themselves. Mr. Russell also told Plaintiffs, after he reviewed Plaintiffs' operations during his visit to the United States, that he would recommend to his employer that the loan be made based on his review.

The record likewise does not support Plaintiffs' claim that Mr. McCann failed to inform them of the lender's fraudulent status and failed to tell them that the loan would not fund. There was no evidence that Mr. McCann or anyone knew of this. In fact, the record establishes that Mr. Start performed an investigation which showed everything was legitimate. The commitment fee of $5,000 was small. In fact, it was less than the $7,000 commitment fee paid by Mr. McCann with respect to his own loans. The lender sent a representative from England to inspect the Plaintiffs' properties. The lender retained competent independent counsel and rejected Plaintiffs' initial proposal for a loan. The record further established that once Nigel Jowsey sent his November 17 fax, all parties were informed immediately of the information except Norris Wright, who received the information five days later on November 22. (Plaintiff's Exhibit 197 establishes that the Usher Trust's U.S. counsel faxed to Norris Wright a copy of the British faxes of November 17 and November 18 on November 22, 1994. *See* Plain-

---

**10.** With respect to whether Plaintiffs would have been able to obtain alternative financing,

see discussion of testimony of Davis Woods and James Sintros, *infra*.

tiffs' Exhibits 193 and 194.) Mr. McCann notified Marcos Koutoufaris of the British faxes via letter dated November 18, 1994, the same day he received the information. Mr. McCann sent Marcos Koutoufaris an "update" on November 22. Plaintiffs' Exhibit 202.

We find that Plaintiffs were made aware of the problem with the lender immediately after Mr. McCann received notice and this finding is supported by the testimony of Norris Wright and Alan Start. Marcos Koutoufaris's testimony is not inconsistent with the finding that Plaintiffs were notified of a problem immediately. Marcos Koutoufaris testified that he received a letter of November 18, 1994, but not the British faxes and did not know of the British faxes until discovery in this case. However, the faxes were attached to the Complaint. His other testimony as well as that of other witnesses indicates that he was timely informed of the British faxes and that they had been sent to him. Mr. McCann testified that he contacted the Koutoufarises immediately and the day after Mr. Wright received a copy of the faxes he had a 19 minute telephone conversation with Marcos Koutoufaris on the subject. The evidence is overwhelming that Plaintiffs had timely notice of the British faxes.[11]

*Removal of the Liens*

■ With respect to the responsibility for removing the liens placed on Plaintiff's property in connection with the loan, we find that Mr. McCann did not participate in creation of the liens and had no responsibility or authority to effect their removal. Furthermore, the testimony established that when it became apparent that the loan would not fund George Gardner and the Morris James Defendants took steps to have the liens removed, including drafting a complaint for filing in the Delaware Chancery Court. The matter was not pursued at the request of Plaintiffs' counsel who asked that the complaint not be filed because this bankruptcy case was to be filed and he wanted the removal to occur within the confines of the bankruptcy case.

Plaintiffs' expert, Geoffrey C. Hazzard, Jr., professor of law at the University of Pennsylvania law school, testified on cross-examination that there was cause to record the liens before the loan was funded in light of Plaintiffs' financial condition. The liens were filed so that a creditor, other than the lender, could not take action that would encumber Plaintiffs' assets and jeopardize the pending loan. In addition, as of February 1995, the Morris James Defendants and Mr. Gardner were involved in attempts to cancel the liens. Plaintiffs knew this and their counsel caused the effort to cease. *See* Marcos Koutoufaris, Tr. 6–30–99 at 231–32. We find Plaintiff's contentions concerning the defendants' liability for failure to remove the liens to be without merit.

*Liability of the Morris James Defendants*

■ The crux of Plaintiffs' case against the Morris James Defendants is the contention that they told the Morris James

11. With respect to the assertion that Mr. McCann was the Usher Trust's agent, we find that the record does not support a finding that an agency relationship existed that would result in Mr. McCann's vicarious liability for the Usher Trust's fraud. An agency relationship exists "when one party consents to have another act on its behalf, with the principal controlling and directing the acts of the agent." *Fisher v. Townsends, Inc.*, 695 A.2d 53, 57 (Del.1997). Mr. McCann merely facilitated communication between the Usher Trust and Plaintiffs. There is no evidence that he acted for the Usher Trust or that his actions were directed or controlled by the Trust. The evidence, in fact, indicates that the Trust sent its own employee, John Russell, to determine whether the loan should be made and Mr. McCann was not involved in that aspect of the transaction.

Defendants to "investigate the lender" and the Morris James Defendants failed to do so. When asked at trial whether he ever told Mr. Wright to "investigate the lender", Marcos Koutoufaris admitted that he had not, nor had he ever heard his parents do so. Tr. 6-3-99 at 249. Some relevant portions of Marcos Koutoufaris' testimony follows:

Q. So despite the fear that you profess, you did wait three weeks to call in your attorneys [the Morris James Defendants] at a time when you wanted to complete the settlement in July; right?

A. Yes.

Q. Now, you never told Mr. Wright to investigate the lender or to look into the lender or to check out this trust or words to that effect, did you?

A. Correct.

Q. You never heard your parents ever say words to that effect, did you?

A. Not to investigate the lender, that's correct. . . . It was we wanted to make sure that we were going to get the funding and that we wanted to make sure that the information that was being sent was to help us get to closing so that we could refinance our businesses. Now, whatever those steps implied, I'm not an attorney to know how to even check out a lender and/or what steps would be needed to protect their clients.

Marcos Koutoufaris, Tr. 6-30-99 at 248-49.

Q. . . . Can we agree that there was no written instructions [sic] to Mr. Wright or Mr. Hitchens or anyone at Morris James to investigate the lender?

A. That is correct. I did say many times . . . and also he heard my parents say on numerous occasions we did not want to get scammed again, that we wanted the money to come through, and if that meant doing whatever they had resources available to look at this job or to what they are doing, then to use those resources. But I did not say the word "please investigate the lender."

Q. Or words to that effect?

A. No.

Marcos Koutoufaris, Tr. 6-30-99 at 208-09.

The fair inference from the testimony is that Plaintiffs assumed, even though they had paid a loan commitment fee before they consulted counsel about the loan, that counsel's professional duty included an investigation of the lender's bona fides. However, the testimony established that this assumption or expectation was never communicated to the Morris James Defendants. The testimony of Professor Hazard established that, under the circumstances, counsel had no duty to investigate the lender.[12] *See infra.*

John Koutoufaris's testimony on the same point is somewhat inconsistent. He testified that he only told Mr. Hitchens that he did not want to go through what he had endured during a previous failed loan transaction with another lender. Tr. 11-1-99 at 457. He further testified that Mr. Hitchens replied, " 'We know our business'. That's the only thing", *id.*, and that he understood this to mean that Mr. Hitchens "is a professional and has past experience of doing this settlement work." *Id.* at 457-48. Later, John Koutoufaris

---

12. It is unlikely that an investigation by the Morris James Defendants could have revealed more than Alan Start's investigation did in early 1994. Mr. Start's investigation showed that the lender's documentation and references were in order and that the police had nothing to report concerning the lender or Rowan Leigh-James. Furthermore, Plaintiffs had already committed to the loan before they sought advice from the Morris James Defendants.

testified that "I did say to them to investigate the lender." *Id.* at § 507. However, despite this statement, we find from the context of John Koutoufaris's testimony as a whole that he never in fact instructed the Morris James Defendants to investigate the lender, although at trial it became clear that this is what he thought counsel was supposed to do in this type of situation,

Marlene Koutoufaris testified that when the family first met with Mr. Wright with respect to the Usher Trust loan she told him that they could not "have this [a repeat of the prior loan fiasco][13] happen again. And, you know, we depend on you to protect us on this" and that Mr. Wright told her that they would "make sure everything is done right." Tr. 6–30–99 at 231–32. However, Marlene Koutoufaris admitted that at no time did she ever specifically ask Mr. Wright "to investigate this trust or to check it out." She expected him to do "what he was supposed to do." *Id.* at 354. However, what Plaintiffs thought counsel should do as opposed to what was communicated to the Morris James Defendants', the Defendants' understanding of their role, and what professional standards required are very different things.

Even if Plaintiffs had communicated to the Morris James Defendants their expectation that Defendants would investigate the lender and Defendants had agreed to such a term as part of their engagement, there was no evidence of what such an investigation should have entailed. The only evidence relevant to this point was the testimony of Alan Start concerning his investigation which indicated that everything was on the up-and-up and no red flags existed. Although there was evidence that at a February 2, 1995, meeting attended by Morris James personnel and Plaintiffs' counsel the Lexis/Nexis databases were searched for a record of Charmeuro and that nothing was found, there was no evidence as to what type of information is to be found by such a search nor was it established that a search in February, 1995, after the fact would have revealed the state of affairs in June and July of 1994. To the contrary, Alan Start testified that he investigated Rowan Leigh–James of the Usher Trust before paying a commitment fee on behalf of himself and Mr. McCann and found only that Mr. Leigh–James was a legitimate businessman who was capable of funding the loan. Tr. 3–27–00 at 17–19. His inquiry to the police in England revealed only that there were no pending actions, *id.* at 18, and that further information was not to be had.

Professor Hazard testified that counsel acted within the bounds of professional responsibility and we accept his testimony. Professor Hazard concluded that there was no duty on the part of the Morris James Defendants to investigate the lender and that the placement of the liens on Plaintiffs' property was not unreasonable in light of the very real threat that another creditor, particularly a taxing body, would obtain a lien or otherwise encumber assets before the loan process was complete.

Professor Hazard opined that when a client informs counsel of a prior experience that the client wishes to avoid it may "heighten the responsibility of communication", Tr. 11–1–99 at 551–52, but it would not "change[ ] anything that you would do, but it's an indication that the client has a particular sensitivity. And ... a lawyer ... has to take into account obvious sensitivities." *Id.* at 552. In this case, Plaintiffs had already committed to a course of action with the Usher Trust before Plain-

---

**13.** The circumstances surrounding the prior transaction were not explored in any detail at trial, but are not in dispute. The details are not material here.

tiffs consulted counsel about it. Furthermore, Plaintiffs' expectation that the Morris James Defendants would investigate the lenders was not communicated to them. In addition, the October 17, 1994, Plaintiff's Exhibit 176, letter of the Usher Trust's U.S. counsel, George Gardner, to its employee Nigel Jowsey questioning whether the loan would ever fund was copied to Marcos Koutoufaris. This was well in advance of the November British faxes and, in Professor Hazard's opinion, was enough to put Plaintiffs on notice that there was a problem. According to Professor Hazard, it was not necessary for the Morris James Defendants to send a letter to Plaintiffs.

With respect to efforts to remove the liens on Plaintiffs' assets, Professor Hazard testified that it would have been "within the range of professional conduct" for the Morris James Defendants to take steps to remove the liens but he did "not think that at this point the danger was so imperative that I would say that the lawyer failed in taking appropriate steps beyond what is done here." Hazard, Tr. 11–1–99 at 557. Moreover, the Morris James Defendants attempted to have the liens removed but were stopped by Plaintiffs' counsel. Professor Hazard also testified that, although the Morris James Defendants "could have done more", what they did was "within the range of professional judgment". *Id.* He testified that, in light of concerns that Plaintiffs' creditors would record liens against the property before the loan process was completed, the dry settlement that took place and the imposition of the liens was appropriate. He would not fault counsel for allowing the liens to be imposed as there was "a good reason to take the risk that was taken." *Id.* at 580–82.

With respect to the British faxes, the fact that Mr. Wright and Marcos Koutoufaris conversed the day after Mr. Wright received a copy of the faxes was significant to Professor Hazard. Hazard, Tr. 11–1–99 at 583–85. Furthermore, Marcos Koutoufaris testified that he had received a copy of a letter concerning the faxes. *Id.* at 589. In addition, when asked to assume that when the British faxes arrived, Plaintiffs were already searching for alternative financing and, by December, 1994, had been unable to find any, Professor Hazard concluded that the Morris James Defendants' advice to consider bankruptcy was in compliance with the standard of care. *Id.* at 591–92.

Plaintiffs also assert that Defendants repeatedly assured them that the loan would fund. Nothing in the record supports this assertion and as early as the month after settlement Plaintiffs were on notice that a potential problem with the loan existed. *See* Plaintiffs' Exhibit 176, letter of October 17, 1994, from George Gardner to Nigel Jowsey. Further, closing was repeatedly delayed due to the fact that Plaintiffs kept changing the specifics of what the loan would entail. The evidence is clear that, when the money did not appear after closing, the Koutoufarises were told by the Morris James Defendants that funding was unlikely.

*Assertion that Davis Wood and James Sintros Would Have Lent But For Defendants' Conduct*

Plaintiffs asserted that, after the Usher Trust loan failed to fund, Davis Wood and James Sintros would have lent to them but for the conduct of the Morris James Defendants which caused the liens to be placed on their property. Davis Wood was an insurance agent and creditor of Plaintiffs who carried the insurance for the Koutoufarises' businesses. Mr. Wood from time to time lent Plaintiffs money. He testified that he would not have been interested in lending Plaintiffs $6.95 mil-

lion (Tr. 11–2–99 at 956) because there was insufficient collateral. In 1992 he had lent $120,000 to a Koutoufaris enterprise and John, Marlene, and Marcos Koutoufaris had guaranteed it. The loan was due to be repaid in 90 days but was not. Mr. Wood eventually instituted suit to collect. He testified that if the Koutoufarises had approached him for a loan he would have wanted collateral, Tr. 11–2–99 at 979, and the banks' refusal to lend to them would have influenced his decision, as would Plaintiffs' failure to pay taxes and vendors. *Id.* at 980. He did not testify, as Plaintiffs represented he would, that he would have provided Plaintiffs with financing. He simply said that if he could have had the first lien on assets and all else was in order, he would have proceeded but could not name a figure that he would have been willing to lend. *Id.* at 981, 987. He testified that if all standards were met, he would lend to Plaintiffs but he said that whether he would have lent was a matter of speculation inasmuch as he had no concrete evidence of Plaintiffs' finances, the amount of money they needed, or anything else. *See* Wood, Tr. 11–2–99 at 978. He testified that he would have had to have seen a financial statement, *id.* at 995, but had not. At trial, Plaintiffs asked him whether he would have considered purchasing the Blue Coat Inn but he testified that it never came up in the discussions with the Koutoufarises, that he might have considered it if the numbers were right, but he did not "know anything about the numbers." *Id.* at 986. He could not say whether he would have even "entertained" the idea of providing financial assistance.

Another witness called by Plaintiffs was James Sintros. John Koutoufaris testified that he "could have gone" to James Sintros, a Boston attorney who did consulting work helping international agencies establish operations in the United States, but that he did not approach him until postpetition. Tr. 11–1–99 at 477. Mr. Sintros's testimony also was not helpful to Plaintiffs inasmuch as he testified that he did not think he could have located financing for them in light of their financial condition. Mr. Sintros testified that if everything was "in order" he could have found some sort of financing for Plaintiffs but this was "just speculation" inasmuch as he did not have sufficient information to determine whether all would have been "in order".

Mr. Sintros testified that before he would lend to Plaintiffs he would have to see balance sheets and profit and loss statements. He testified that he saw some numbers but did not recall any specifics. Mr. Sintros testified that, because of his reputation, prospective lenders would look at what he forwarded to them but his work on behalf of Plaintiffs never went as far as filing a loan application. He testified that "if there was … good reason to … loan [sic] the money, if everything was … presented, then, … they [lenders] would have done their due diligence. And if it was something they wanted to fund, they would have." Sintros, Tr. 11–1–99 at 607–08. In addition, he testified that "[i]f everything was in order" he might have been able to get Plaintiffs some funding "but again, it is just speculation." *Id.* at 622. This testimony refutes Plaintiffs' assertion that they could have gotten alternative financing.[14]

---

14. Plaintiffs offered the testimony of Randall C. Handy, Jr., a commercial real estate broker and certified appraiser in the state of Delaware. Mr. Handy offered an opinion of the value of the Blue Coat Inn and the Blue Coat Inn Pancake House as of 1998. However the value of the property in 1998 does not reflect the value of the business at the relevant time in 1994. The witness testified that he had not appraised the value of the business as of 1994. Tr. 3–27–01 at 103. With respect to evidence of valuation of the property in 1994, neither

We find that Plaintiffs' allegation that the conduct of the Morris James Defendants caused their bankruptcy is without merit. Plaintiffs' financial situation was desperate. They needed refinancing to pay their debts and to keep their suppliers doing business with them. They introduced no evidence that any entity other than the Usher Trust was willing to lend to them under the circumstances as they existed in 1994 when Plaintiffs sought financing through the Usher Trust. The testimony of their own expert supports the conclusion that the professional conduct of the Morris James Defendants was within the appropriate range of professionalism.

Plaintiffs also argued that their creditors would have been willing to forebear because they did so while waiting for the loan to fund. However, creditors refrained from taking action through Mr. McCann's and the Morris James Defendants' efforts on Plaintiffs' behalf. Furthermore, because creditors had previously refrained from exercising their rights is not evidence that they would continue to do so. Suppliers had Plaintiffs on COD before the time Plaintiffs began negotiations with the Usher Trust. In addition, as early as November 1, 1994, Wilmington Trust sent notices of default. Despite the fact that Plaintiffs, Mr. McCann and the Morris James Defendants continued to seek alternative financing on Plaintiffs' behalf, on December 9, 1994, one of Plaintiffs' suppliers wrote to the Blue Coat Inn demanding liquidation of an obligation in excess of $90,000. In January, 1995, another food supplier, Tartan Sysco, sued the Blue Coat Inn for debt in excess of $180,000. With the worsening financial condition of the companies, alternative financing did not occur.

the witness nor the Defendants were given the documentation Plaintiffs sought to introduce into evidence and the testimony offered in

*Conclusion*

We find that, based on the evidence and testimony at trial, judgment should be entered for all Defendants and against Plaintiffs.

An appropriate order will be entered.

connection with the exhibit (Plaintiff's Exhibit 277) was stricken. Tr. 3–27–00 at 101–02.